UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
EMANUEL K. MOORE,                              :
                                               :
                              Plaintiff,        :
                                               :            **OPINION AND ORDER**
                -against-                       :            14-cv-05697 (DLI)
                                               :
COMMISSIONER OF SOCIAL SECURITY,               :
                                               :
                              Defendant.        :
-----------------------------------------------------------------x
**DORA L. IRIZARRY, Chief Judge:**

On August 31, 2011, Emanuel K. Moore ("Plaintiff") filed an application for Social Security disability insurance benefits ("DIB") under the Social Security Act, alleging disability beginning December 1, 2009. (*See* Certified Administrative Record ("R."), Dkt. Entry No. 25 at 178, 182.) On January 27, 2012, Plaintiff's application was denied (R. 68-73), and he timely requested a hearing. (R. 74-77.) After an initial hearing at which Plaintiff indicated he wished to adjourn in order to seek representation, on February 27, 2013, Plaintiff appeared with his representative before Administrative Law Judge Michael Friedman (the "ALJ"). (R. 39-60.) By decision dated March 14, 2013 (the "Decision"), the ALJ concluded that Plaintiff was disabled and entitled to DIB as of February 24, 2013, but not prior thereto. (R. 14-26.) On August 12, 2014, the Decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request to review the portion of the Decision finding Plaintiff was not disabled prior to February 24, 2014. (R. 1-6.)

On September 25, 2014, Plaintiff filed this appeal seeking judicial review of the Decision, pursuant to 42 U.S.C. § 405(g). (*See* Complaint, Dkt. Entry No. 1.) The Commissioner moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, to affirm the denial of benefits. (*See* Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings

("Defendant's Motion" or "Def. Mot."), Dkt. Entry No. 20.) Plaintiff cross-moved for judgment

on the pleadings, seeking reversal of the Commissioner's decision or, alternatively, remand to the

Social Security Administration ("SSA") for further proceedings. (*See* Mem. of Law in Supp. of

Pl.'s Cross Mot. ("Plaintiff's Cross Motion" or "Pl. Cross Mot."), Dkt. Entry No. 22.) For the

reasons set forth below, the Commissioner's motion for judgment on the pleadings is granted and

Plaintiff's motion for judgment on the pleadings is denied. The instant appeal is dismissed.

## BACKGROUND[1]

### A. Non-Medical Evidence

Plaintiff was born in 1963 (Tr. 35, 174) and obtained a GED in 1981 (R. 183). He stated

that he had worked as a barber off and on from January 1995 to December 1, 2009 (R. 183-84; *see*

176), and as of the date of the hearing, he lived with a friend (R. 47). In a disability report

submitted with his application in 2011, Plaintiff stated that he had stopped working because he

was in pain and could not stand up to do his job. (R. 182.) In the same report, Plaintiff reported

taking APAP (acetaminophen) with Codeine, Cephalexin, Cyclobenzaprine, Fioricet, Gabapentin,

Ibuprofen, Methocarbamol, Naproxen, Seroquel, Tramadol, and Wellbutrin. (R. 185.)

Plaintiff completed a function report dated October 21, 2011 (R. 193-201), in which he

reported that, on a typical day, he sat in bed for an hour with back pain, took a hot bath and

medication, went back to sleep, and took more medication for back pain. (R. 194.) Plaintiff did

not wear clothes with zippers and could not bend over to tie sneakers. (*Id.*) He was unable to use

the shower when his pain was severe. (*Id.*) He went to the barbershop for his hair and stated that

shaving took 30 minutes because of pain. (R. 195.) He was able to feed himself and could

---

[1] Having thoroughly and carefully reviewed the administrative record, the Court finds the Commissioner's factual background accurately represents the relevant portions of the record. Accordingly, the background information that follows is taken largely from the "Administrative Record" section of Defendant's Motion.

independently use the toilet, but sometimes experienced pain. (*Id.*) Plaintiff needed help getting dressed and reported preparing simple meals daily due to problems standing and using a knife and needing help with chores. (R. 195-96.) Plaintiff attended appointments weekly and tried to walk once or twice a week. (R. 196.) He walked, rode in a car, and used public transportation, and sometimes he was able to go out alone. (R. 196.)

Plaintiff had a driver's license, but said he could not drive safely because of neck pain, problems turning the steering wheel, and knee pain. (R. 197.) He reported he went grocery shopping once per month for three hours, and was able to pay bills and handle a savings account. (*Id.*) He reported problems concentrating, focusing, and finishing what he started. (R. 197, 200.) Plaintiff watched television, but no longer played sports, skated, rode a bike, or went fishing. (R. 197.) He reported not getting along with others, feeling paranoid, and hearing voices. (R. 198, 200.) Plaintiff did not like crowds or bright lights. (R. 198.) He reported problems lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, reaching, using hands, seeing, and talking, and used a cane, brace, and orthopedic shoes. (R. 198-200.) Plaintiff stated that he could walk only one block before having to rest for ten minutes. (R. 200.) He could follow spoken instructions, but not written instructions, and had problems getting along with people in authority. (*Id.*) He indicated that he was always angry, anxious, and in pain, and that stress caused anxiety and concentration problems. (R. 201.)

In a pain questionnaire also dated October 21, 2011 (R. 201-04), Plaintiff reported that pain had started affecting his activities in December 2009. (R. 201.) The pain was sharp, intense, stabbing, throbbing, burning, and aching. (*Id.*) Plaintiff felt pain in his neck, back, shoulders, scrotum, knee, and spine. (R. 202.) The pain radiated from his neck to his buttocks. (*Id.*) Plaintiff's pain was constant and brought on by physical activity. (*Id.*) He took pain medication

that helped for two hours, but it made him drowsy.  (R. 202-03.)  To relieve pain, he also used a cane, took hot baths, used heating pads, and smoked marijuana.  (R. 203.)  Plaintiff reported that he had severe body pain that affected his ability to walk, play sports, bathe, and sleep, and that his daily activities were limited to attending medical appointments.  (*Id.*)

During psychological examinations, Plaintiff reported his criminal history included the following:  (i) he served three years for robbery committed at age 12 or 13 (R. 270, 277); (ii) he served either one year (R. 270) or eight years (R. 277) in prison for armed robbery in 1983; (ii) he served two years for a robbery committed in 1991; (iii) he served three-and-a-half years in prison for a 2003 arrest for possession of an altered shot gun (R. 270, 277); and (iv) he served four months in prison in 2010 for violating parole (R. 270).  Plaintiff also noted that he was scheduled to have a July 2011 court date for a February 2011[2] robbery arrest.  (*Id.*)

### B.  Medical Evidence Before the ALJ

#### 1.  Medical Evidence Prior to August 31, 2011 (SSI Application Date)[3]

Plaintiff saw Wasfy Zaki, M.D., an internist at Woodhull Medical and Mental Health Center ("Woodhull"), on June 21, 2010, stating that he had pains all over.  (R. 248-50.)  A psychiatric examination was normal, including normal affect and no evidence of a thought disorder.  (R. 248.)  Based on Plaintiff's answers to questions on a Patient Health Questionnaire

---

[2]    Although the psychosocial assessment states that this robbery arrest occurred in February 2010 (R. 270), the rest of the record suggests the arrest occurred in February 2011 (*see* R. 235, 237, 240-41, 275, 277, 283).

[3]    The earliest month for which SSI benefits generally can be paid is the month following the month an application is filed.  42 U.S.C. § 1382(c)(7); *see* 20 C.F.R. § 416.335.  Hence, the relevant period in this appeal is August 31, 2011, the date the SSI application was filed, to February 24, 2013, the date Plaintiff was found to be disabled.

("PHQ-9"), he was given a score of 16, which suggested moderately severe depression. (R. 249-50.)

Dr. Zaki examined Plaintiff again on July 1, 2010. (R. 251-52.) On mental status examination, Plaintiff was alert and fully oriented, and there was no evidence of thought disorder. (R. 251.) A neurological examination and examination of the eyes, abdomen, and extremities were normal. (*Id.*) Dr. Zaki diagnosed "myalgia and myositis, unspecified" and possible fibromyalgia, due to Plaintiff's complaints of pain all over his body. (*Id.*) Plaintiff returned to Dr. Zaki on April 12, 2011, at which time Plaintiff was reported to have a normal affect and no evidence of a thought disorder. (R. 244.) Plaintiff's physical examination, including examination of the neck, back and extremities, was normal. (*Id.*) Dr. Zaki assessed chronic back pain, recommended physical therapy and prescribed Ibuprofen and Neurontin. (R. 244-45.)

On February 10, 2011, Plaintiff was admitted to Bellevue for treatment of a facial injury that occurred during a robbery for which he was arrested. (*See* Tr. 240-42; 270.) He underwent an open reduction internal fixation of a right orbital fracture on March 4, 2011. (R. 235-39, 243). During follow-up visits to Bellevue on March 10 and April 7, 2011, Plaintiff received positive reports. (R. 233-34.) A CT-scan of the head performed on March 21, 2011, revealed no evidence of acute intracerebral hemorrhage, mass, or infarction. (R. 257.)

Following his February 2011 hospitalization, Bellevue referred Plaintiff to East New York Diagnostics & Treatment Center ("East NY Center"). (R. 283.) Following a series of appointments in March and April 2011, Elizabeth Donahue, Ph.D., a psychologist at East NY Center, completed a psychosocial assessment of Plaintiff. (R. 270-74.) Plaintiff reported anger problems, noting that he experienced paranoia and heard voices telling him to strike others. (R. 270.) Plaintiff also reported a long history of depression and auditory hallucinations. (*Id.*)

Plaintiff reported a history of drug and alcohol abuse in the past, but currently his drug use was limited to smoking three to four joints per day to "calm himself." (R. 271.) He complained of arthritic pain in his shoulder, neck, and knees. (R. 272.) He lived with his girlfriend at the time, but had conflicts when his mood was unstable, at which time she would "put[] him out." (R. 273.) Plaintiff stated that he had last worked at a barber shop in October 2010, but lost his job because he did not bring in enough business. (R. 274.) Plaintiff supported himself through food stamps and by selling illegal cigarettes. (*Id.*) He obtained his GED, attended some college courses while incarcerated and reported enjoying reading. (*Id.*) Dr. Donahue recommended psychotherapy and medication. (*Id.*)

Another psychiatric assessment was completed on May 4, 2011, by Beverly Nedd, a psychiatric nurse practitioner at East NY Center. (R. 275-79.) Plaintiff reported psychiatric hospitalizations at age 17, and in February 2011, when he had a fight in a store while experiencing an auditory hallucination. (R. 275.) He complained of depressed mood, anxiety, sleep disturbances, difficulty concentrating, and intermittent command auditory hallucinations. (*Id.*) He had taken Thorazine in the past, and was currently taking a muscle relaxer and an anti-inflammatory. (R. 275-76.) On mental status examination, he was cooperative and had good eye contact, but reported being sad. (R. 277.) His speech and psychomotor activity were normal. (*Id.*) Plaintiff denied perceptual disturbances and delusions. (*Id.*) His thought process was goal directed, and his thought content had no preoccupations. (*Id.*) He denied suicidal ideation. (*Id.*) His impulse control was impaired. (*Id.*) Plaintiff's insight was fair. (R. 278.) His judgment was impaired. (*Id.*) His intelligence was average. (*Id.*) He was alert and fully oriented. (*Id.*) His memory and concentration were fair. (*Id.*) Plaintiff was diagnosed with schizoaffective disorder

and polysubstance abuse, and assigned a GAF score of 55.[4]  (*Id.*)  He was prescribed Paxil and Seroquel.  (R. 279.)

On May 2, 2011, Plaintiff went to the emergency department at Woodhull Hospital, complaining of head, back, and left knee pain of three days' duration.  (R. 258-60.)  He was ambulatory and in moderate distress.  (R. 258, 260.)  On July 25, 2011, Plaintiff saw Roman Sapozhnikov, M.D., an internist at Woodhull Hospital.  (R. 246-47.)  On examination, Plaintiff was well developed and in no acute distress.  (R. 246.)  He was alert and fully oriented.  (*Id.*)  His affect was normal, and there was no evidence of a thought disorder.  (*Id.*)  Plaintiff reported that he had "a lot" of low back and left knee pain.  (R. 247.)  Dr. Sapozhnikov diagnosed:  headache, pain in joint, and backache.  (R. 246.)  Tramadol and Flexeril were prescribed.  (R. 247.)  A report from the radiology department of the hospital on the same day showed degenerative changes, but no acute fracture or dislocation.  (R. 255.)  Left shoulder x-rays taken that day also showed degenerative changes; the right shoulder was unremarkable.  (R. 256.)

An MRI of the lumbosacral spine conducted on August 18, 2011, showed L4/L5 degenerative disc disease with a small broad-based posterior disc protrusion extending through the inner apertures of the neural foramina.  (R. 253.)  There was mild bilateral posterior zygapophyseal joint hypertrophy and bilateral foraminal stenosis.  (*Id.*)  There were mild L2/L3 degenerative disc changes with small focal left paramedian posterior disc protrusion extending to the inner aperture

---

[4]        Global Assessment of Functioning ("GAF") is a rating of overall psychological functioning on a scale of 0 to 100.).  *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008).  "A GAF between 51 and 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or coworkers)."  *Id.*  (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.2000)).  However, the Social Security Administration has limited the use of GAF scores in making disability assessments.  *See Mainella v. Colvin*, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) (citing SSA bulletin).

of the left neural foramen and mild foraminal narrowing. (*Id.*) There was L5/S1 degenerative disc desiccation. (*Id.*)

### 2. Medical Evidence from August 31, 2011 to February 24, 2013

On November 9, 2011, Plaintiff described his childhood to Dr. Donahue. (R. 289.) He indicated that he once had to burn a cat order to join a boys group, stating that he then "became a bully" in order not to be bullied, but "knew it was wrong." (*Id.*) On November 14, Dr. Donahue found Plaintiff's mood to be mildly depressed. (R. 290.) His affect and mood were congruent. (*Id.*) Plaintiff reported anger, but denied aggressive behavior. (*Id.*) He had intermittent auditory hallucinations, but nothing current. (*Id.*) He was having problems with his girlfriend and feared being thrown out of her apartment. (*Id.*) On November 21, Dr. Donahue noted that Plaintiff was depressed. (R. 292.) Plaintiff had been involved in a physical altercation, but denied any provocation. (*Id.*) He denied suicidal or homicidal ideation. (R. 293.)

A cervical MRI performed on December 8, 2011 (R. 308-09), showed, *inter alia*, moderate to marked cervical spondylarthrosis from C4/C5 through C6/C7 with associated central canal stenosis and mild ventral cord atrophy at C4/C5 and C5/C6 (R. 309).

In a letter dated March 8, 2012, Dr. Sapozhnikov stated that Plaintiff was treated at Woodhull Hospital for severe osteoarthritis of the spine, back pain, left knee pain, and headaches. (R. 328.) Because of these problems, he was unable to lift, push, or pull, and could not sit or walk for prolonged periods. (*Id.*)

On June 21, 2012, Robert Andrews, M.D., a psychiatrist at East NY Center, completed a medical source statement. (R. 330-36.) He stated that Plaintiff's symptoms included paranoid delusions, hallucinations, depressed mood, anger, hypervigilance, poor attention and concentration, sleep disturbances, and chronic pain. (R. 330.) The medications he was taking at

the time were Seroquel and Wellbutrin, and he did not report side effects. (R. 331.) Dr. Andrews noted a long history of emotional difficulties, which started when he was first incarcerated as an adolescent. (R. 332.) Mental status examination revealed that Plaintiff was cooperative; his manner of relating was somewhat guarded. (R. 333.) His speech was of a normal rate. (*Id.*) Thought process was coherent; thought content was paranoid. (*Id.*) Plaintiff reported intermittent paranoid delusions and hallucinations. (*Id.*) His mood was depressed and irritable. (*Id.*) His affect was somewhat labile to appropriate. (*Id.*) Plaintiff was fully oriented. (*Id.*) Attention and concentration were poor. (*Id.*) His memory was fair, information was adequate, and his ability to perform calculations was poor. (*Id.*) Plaintiff's insight was fair, but his judgment was impaired. (*Id.*)

Dr. Andrews stated that Plaintiff reported difficulty accepting instructions from supervisors and had been terminated from his last job in October 2010 due to conflicts with his boss. (R. 334.) Dr. Andrews diagnosed schizoaffective disorder, assigned a GAF of 55 (R. 332), and opined that Plaintiff could not work because of chronic paranoid delusions and auditory hallucinations (R. 334). Dr. Andrews opined that Plaintiff had limitations in understanding and memory, concentration and persistence, social interaction, and adaptation. (R. 335.) On February 26, 2013, Dr. Andrews added an update to his June 21, 2012 medical source statement. (R. 338-44; *compare with* 330-36.) He stated that Plaintiff's dosage of Wellbutrin and Seroquel had been increased. (R. 338.) His diagnoses and limitations remained the same. (*Id.*)

In a letter dated February 12, 2013, Dr. Sapozhnikov stated that Plaintiff had severe degenerative joint disease in all joints, especially in his spine, hands, knees, and shoulders. (R. 351.) His condition was getting worse. (*Id.*) Dr. Sapozhnikov opined that Plaintiff could not work "because it can cause severe damage to his body and/or even make him get paralyzed." (*Id.*)

### 3.   Consultative Examinations

Ammaji Manyam, M.D., performed an internal medicine consultative examination on November 7, 2011.  (R. 298-302.)  Plaintiff complained of pain in the neck, right side of the back, left knee, left shoulder, and scrotum.  (R. 298.)  He had taken a number of pain medications in the past, and had become addicted to OxyContin.  (*Id.*)  He reported smoking at least 4 joints per day, and was taking pain medication that reduced his pain to 2/10.  (R. 298-99.)  Plaintiff stated that his auditory hallucinations were controlled with medication.  (R. 299.)  His activities of daily living included cooking four to five times per week, bathing, dressing, watching television, reading magazines, medical appointments, and listening to the radio.  (*Id.*) On physical examination, Plaintiff was clutching his groin area, but was in no acute distress.  (R. 300.)  His gait was normal; he could walk on his heels and toes and perform a full squat.  (*Id.*)  His stance was normal.  (*Id.*) He used no assistive devices, and did not need help changing for the exam or getting on and off the exam table.  (*Id.*)  Plaintiff could rise from a chair without difficulty.  (*Id.*)  His cervical spine showed full flexion, extension, and rotary movement.  (R. 301.)  There was mild scoliosis toward the right side in the lower thoracic area.  (*Id.*)  There was no abnormality in the thoracic spine. (*Id.*)  His lumbar spine had full ranges of motion, and straight leg raising was negative.  (*Id.*)  There was full range of motion in the upper and lower extremities, with full dexterity and grip strength. (*Id.*)  A neurological examination revealed that deep tendon reflexes were physiologic and equal; there was no muscle atrophy or sensory deficit.  (*Id.*)  Dr. Manyam diagnosed:  psychiatric illness with history of hearing voices; generalized body pain without any positive findings on clinical examination due to musculoskeletal pain; mild thoracic scoliosis toward the right; and history of degenerative disk disease in the lower back.  (*Id.*)  He opined that Plaintiff had no limitations to

physical activities, such as prolonged sitting, prolonged walking, climbing, lifting, and carrying weight, pulling, and pushing. (*Id.*)

Michael Alexander, Ph.D., performed a psychiatric consultative examination on November 7, 2011. (R. 304-07.) Plaintiff had independently taken public transportation to the examination. (R. 304.) He said he had stopped working as a barber in 2009 because of his back pain. (*Id.*) He reported that the medications provided by his psychiatrist (Seroquel and Bupropion) significantly helped reduce the intensity of his symptoms, and he no longer heard voices that would urge him to fight. (R. 304-05.) When he did hear them, he ignored them. (R. 305.) Plaintiff dressed, bathed, and groomed himself. (R. 306.) He cooked, cleaned, shopped, and managed his money. (*Id.*) He had one close friend, but was not close to family. (*Id.*) He spent his time at home watching television and going to physical therapy. (*Id.*) On mental status examination, Plaintiff was cooperative and friendly, and his manner of relating and social skills were adequate. (R. 305.) He walked slowly using a cane. (*Id.*) His posture and motor behavior were normal, and his eye contact was appropriate. (*Id.*) Plaintiff's expressive and receptive language was adequate. (*Id.*) His affect was of full range and appropriate in speech and thought content. (*Id.*) His mood was neutral, and sensorium was clear. (R. 306.) Plaintiff was fully oriented. (*Id.*) His attention, concentration, and memory were intact. (*Id.*) His cognitive functioning was average, and his insight and judgment were adequate. (*Id.*) Dr. Alexander diagnosed psychotic disorder, not otherwise specified ("NOS"), and impulse control disorder, NOS, in remission. (R. 307.) He opined that Plaintiff could follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress. (R. 306.)

On January 23, 2012, Dr. E. Gagan completed a Psychiatric Review Technique. (R. 310-23.) Dr. Gagan assessed that Plaintiff had moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (R. 320.) He had had one or two repeated episodes of deterioration. (*Id.*) In a Mental Residual Functional Capacity Assessment (R. 324-27), Dr. Gagan opined that Plaintiff was able to: understand, remember, and carry out simple instructions; maintain concentration, persistence and pace; interact with others; and adapt to changes (R. 326).

### C. Plaintiff's Testimony

Plaintiff testified during a hearing held on February 27, 2013. At the hearing, Plaintiff was wearing a right wrist support and a cervical collar, and carried a cane. (R. 48.) Plaintiff stated that he was wearing the wrist support because he had fallen "the other day." (R. 55.) He also brought with him a back brace in a bag that he used for long walks, and that he had a knee brace at home. (R. 47.) He took about eight medications (R. 53; *see* R. 40), which helped relieve his pain, but made him drowsy (R. 48, 55). Plaintiff said he had attended physical therapy and received pain injections in the lower lumbar spine at Bellevue Hospital ("Bellevue") one year earlier. (R. 49.) He also took medications for his mental problems and stated, "I feel much better on my meds," but heard voices when he was not taking his medications. (*Id.*) He reported feeling anxious and depressed, and having difficulty concentrating and focusing. (R. 50-51.)

Plaintiff stated that he could stand for about 15 minutes, but leaned when standing due to neck pain. (R. 51.) He could sit for five minutes, walk about four blocks, and lift five pounds. (*Id.*) Plaintiff reported that he had taken public transportation to the hearing. (R. 52.) Plaintiff was able to go shopping with his "lady friend," who helped him a lot, clean, and watch sports on television. (*Id.*) He did not drink alcohol, but smoked cigarettes. (*Id.*) Plaintiff testified that his

"aches and pains" started gradually in 1986, but that his present pain was "unbearable." (R. 53.) He was to have a lumbar injection on March 28, 2013. (R. 55-56.) Due to a neck problem, he sometimes experienced numbness in his hands and legs and swelling in his hands. (R. 56.) Plaintiff reported headaches and pain in his neck and throughout his back for which he had recently been referred to a spine specialist. (R. 57.)

## DISCUSSION

### A.     Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal citations omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by

the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp.2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citations omitted).

**B.    Disability Claims**

To receive disability benefits, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. If, at any step, the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to

age, education and work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental ability to conduct basic work activities. 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("the Listings"). *See* 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity ("RFC") in steps four and five. 20 C.F.R. § 404.1520(e). In the fourth step, the claimant is not disabled if he or she is able to perform past relevant work. 20 C.F.R. § 404.1520(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(g).

## C.     The Decision

On March 14, 2013, the ALJ issued the partially favorable Decision, concluding that Plaintiff was disabled and entitled to DIB as of February 24, 2013, but was not disabled prior to that date. (R. 14-26.) ALJ followed the five-step procedure in determining that prior to February 24, 2013, which is the date Plaintiff turned fifty, Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), and, therefore, was not disabled. (R. 18-25.) The ALJ found, however, that Medical Vocational Guidelines (know as the "Grids") directed a finding of disability as of the date on which Plaintiff's age category changed.

At the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 1, 2009, the alleged onset date. (R. 20.) At the second step, the ALJ found the following severe impairments: neck and back disorder and schizoaffective disorder. (*Id.*) At the third step, the ALJ concluded that Plaintiff's impairment did not meet or equal an

impairment included in the Listings. (*Id.*) The ALJ specifically looked to the disability regulations for evaluating mental disorders in at 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00, and found that Plaintiff did not meet any of the listed criteria. (*Id.*) The ALJ also considered whether Plaintiff satisfied any of the "paragraph C" criteria contained in §§ 12.02, 12.03, 12.04 and 12.06, and found that "[t]here is no evidence of record of a medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder, or chronic affective disorder, or any other chronic organic mental disorder" that meets the criteria. (R. 20-21.)

At the fourth step, the ALJ found that Plaintiff was unable to perform his past relevant work, but determined that Plaintiff had an RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), "except claimant can only perform jobs involving simple, routine, repetitive type tasks involving only occasional contact with others." (R. at 21-24.) In support of the RFC determination, the ALJ noted, among other things, that (i) Plaintiff's "abilities to perform activities of daily living show that claimant has greater exertional capacity than he claimed in his testimony," and (ii) Plaintiff "has had the same impairments for decades, but he has comparatively little medical treatment." (R. 22.) The ALJ ultimately concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but "the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (R. 24.)

At the fifth step, the ALJ applied the Grids to determine that the 20 C.F.R. § Pt. 404, Subpt. P, App. 2, § 201.21 directed a finding of "not disabled" prior to February 24, 2013, when Plaintiff was considered a "Younger individual age 45-49." (R. 25.) As of Plaintiff's fiftieth birthday, however, Plaintiff was considered a person "Closely approaching advanced age," pursuant to § 201.14 of the Grids. The ALJ found that a direct application of this rule required a finding of

"disabled" as of that date.  (*Id.*)

**D.    Analysis**

The Commissioner moves for judgment on the pleadings, seeking affirmance of the denial of Plaintiff's benefits on the grounds that the ALJ applied the correct legal standards to determine that Plaintiff was not disabled prior to February 24, 2013, and that the factual findings are supported by substantial evidence.  (*See generally* Def. Mot.)  Plaintiff cross-moves for judgment on the pleadings, contending that the ALJ's partially unfavorable decision denying DIB prior to February 24, 2013 "was not supported by substantial evidence and reached through material error." (Pl. Cross. Mot. at 4.)  Plaintiff principally argues that the ALJ:  (i) failed to fully develop the record (*Id.* at 10); (ii) incorrectly discounted certain medical opinions in preference to others (*Id.* at 9-11); (iii) failed to properly assess Plaintiff's credibility (*Id.* at 11); and (iv) failed to obtain a vocational expert to evaluate Plaintiff's RFC (*Id.* at 4).[5]

Upon review of the record, the Court finds that the ALJ applied the correct legal standards, and his decision is supported by substantial evidence.  Plaintiff's arguments to the contrary are meritless.

**1.   Unchallenged Findings**

The ALJ's findings as to steps one, two and three appear to be unchallenged.  (*See generally* Pl. Cross Mot.)  Upon review of the record, the Court concludes that the ALJ's findings at steps one, two and three are supported by substantial evidence.

**2.   The ALJ's Duty to Develop the Record**

Plaintiff argues, alternatively, that the ALJ did not do enough and did too much to develop

---

[5]    In addition to Plaintiff's Cross Motion, the Court has reviewed the entire record, including Plaintiff's prior counsel's much more substantive brief in support of Plaintiff's application to the Appeals Council (R. 219-226), and believes these are the issues requiring this Court's attention.

the record.  Plaintiff asserts that the ALJ had a duty to "develop the record further" in light of a "substantial gap in treatment records."  (Pl. Cross Mot. at 9-10.)  Specifically, Plaintiff argues that the ALJ "did not make 'all reasonable efforts,' through interrogatories compulsory process, or otherwise, to obtain all the medical evidence necessary in support of a determination concerning impairment severity and the RFC and to satisfy his obvious concerns regarding the quality of the doctors['] professional observations or conclusions."  (*Id.*)  Plaintiff also takes issue with the ALJ's decision to call for consultative evaluations, arguing, without support, that such evaluations may only be made after it is found that "treating medical sources cannot provide such essential [missing medical] information."  (*Id.* at 9.)  Both arguments are without merit.

In light of the non-adversarial nature of social security proceedings, the ALJ has an affirmative duty to develop a full and fair record.  *See Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009); 20 C.F.R. § 404.1512(d)-(f) (setting forth the affirmative obligations of ALJs). Plaintiff's claim can be remanded to the Commissioner "[w]here there are gaps in the administrative record."  *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)).  Here, the ALJ here satisfied his duty to develop the record, which contains detailed medical files from each of the hospitals at which Plaintiff reported receiving treatment.  (*See generally* R.; *see also*, Background § B., pp. 4-12, *supra*.) Plaintiff's generalized assertions that the ALJ should have done more to clarify the treating physician's opinions are undercut by, for example, acknowledgements that his treating psychiatrist "reported seeing [Plaintiff] weekly, and did, in fact, specify the nature, severity and extent of the Plaintiff's limitations . . ."  (Pl. Cross Mot. at 10.)  Moreover, a review of the hearing transcript shows that Plaintiff and his then attorney made no mention of any additional material that would be helpful to the ALJ (R. 31-60); indeed, the only outstanding issue at the end of the hearing was

the preparation of a complete list of Plaintiff's medications, which was provided later that day (*see* R. 218).

Similarly, the ALJ had discretion to seek consultative examinations prior to contacting Plaintiff's treating physician for additional information. As Defendant correctly points out, the regulations provide administrative law judges flexibility to determine how to develop the record in assessing a claimant's alleged disability. In particular, 20 C.F.R. § 416.920b(c)(3), which states that an ALJ "may ask you to undergo a consultative examination at our expense," does not contain any limitations on when such an examination may be requested. As discussed more fully below, there is ample support in the record for the ALJ's ultimate conclusion that the medical evidence in the record supported the RFC determination.

### 3. Plaintiff's RFC and the Treating Physician's Rule

Plaintiff contends that the ALJ erred by failing to assign the proper weight to his treating physicians, including Dr. Andrews. (Pl. Cross Mot. at 9-10.)

With respect to "the nature and severity of [a claimant's] impairment(s)," 20 C.F.R. § 404.1527(d)(2), "[t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). A claimant's treating physician is one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988). A treating physician's medical opinion regarding the nature and severity of a claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). "While the opinions of a

treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted). Where a treating source's opinion is not given controlling weight, the proper weight accorded by the ALJ depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see also* 20 C.F.R. § 404.1527(c)(2).

In the instant case, the ALJ discussed the objective medical evidence supporting his RFC determination with respect to Plaintiff's physical and mental limitations. The ALJ's review encompassed, among other things: (i) the clinical findings of Drs. Manyam, Sapozhnikov, Zaki, Andrews, and Alexander; (ii) the imaging results assessed by the doctors at Woodhull; and (iii) the psychological assessments of the doctors at East NY Center. (*See* R. 21-24.) Plaintiff's physical and mental limitations are assessed below, in turn.

### a. Plaintiff's Physical Limitations

With respect to Plaintiff's physical limitations, the ALJ afforded "great weight" to the results of the imaging conducted by the treating doctors at Woodhull, finding that the results "were consistent with the ability to perform sedentary work," in light of, among other things, claimant's abilities to perform activities of daily living and the lack of medical treatment he has received. (R. 22.) This conclusion is supported by other medical records from Woodhull, which show diagnoses of, for example, unspecified myalgia and myositis (R. 251-52), and headache, backache and unspecified joint pain (R. 246, 295-96). Contrary to Plaintiff's argument, the ALJ did not err by placing less weight on Dr. Sapozhnikov's two one-paragraph letters (R. 328, 351), one of which

was prepared weeks prior to Plaintiff's hearing before the ALJ, and neither of which were accompanied by contemporaneous medical records. Although Dr. Sapozhnikov may have been a treating physician at Woodhull, the Court finds that the ALJ properly disregarded these letters due to their conclusory nature and the lack of any medical records to support the limitations identified.[6]

The ALJ's conclusions with respect to Plaintiff's physical limitations are also supported by the findings of consultative examiner Dr. Manyam (R. 298-302), and by Plaintiff's own statements, which included that: (i) he can cook, clean, attend medical appointments and use public transportation independently; and (ii) that he could walk for four blocks, stand for 10-15 minutes and lift five pounds (R. 51-52). Plaintiff also reported to one of the consultative examiners that his pain was reduced to a "2/10" when taking medication. (R. 299.) Overall, Plaintiff has not presented, at any point, medical evidence to support his claims that his physical limitations prevented him from performing sedentary work. As such, the ALJ's RFC determination was appropriate.

### b. Plaintiff's Mental Limitations

The record contains comparatively more evidence of Plaintiff's mental limitations, but does not contain any evidence that disturbs the ALJ's conclusion that Plaintiff's impairments would not have impeded his ability to perform sedentary work during the period at issue.

Plaintiff's main argument with respect to his mental limitations is that the ALJ erred by assigning "little weight" to the conclusions of Plaintiff's treating psychiatrist, Dr. Andrews, who

---

[6] Indeed, of the medical files contained in the Record, Dr. Sapozhnikov's diagnoses of Plaintiff appears to be limited to the following: "headache," "pain in joint, site unspecified" and "backache, unspecified." (R. 246, 295-96.) On one of these visits, Dr. Sapozhnikov noted that Plaintiff was "well developed & nourished, in no acute distress." (R. 246.) Nothing else in the Record supports the limitations described in Dr. Sapozhnikov's March 2012 and February 2013 letters, and as such, the ALJ correctly gave these statements little weight. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given.").

concluded that "[d]ue to chronic paranoid delusions and auditory command hallucinations, [Plaintiff] has shown a decrease in cognitive functioning that precludes him from working." (R. 334; *see* Pl. Cross Mot. at 10.) In deciding less weight should be given to Dr. Andrews' conclusions, the ALJ noted that the conclusions were: (i) not supported by treating records; (ii) inconsistent with other medical opinions and files in the Record; and (iii) based, in significant part, on Plaintiff's own complaints about his condition. (*See* R. 23.)

Upon review of the entire Record, the Court finds that the ALJ afforded the proper weight to Dr. Andrews' conclusions for the reasons stated in the Decision. Of particular note, Dr. Andrews appears to have based his opinion more on the subjective statements Plaintiff made about his condition and less on Plaintiff's actual condition. For example, Dr. Andrews' conclusions that Plaintiff had limited functioning in certain areas was supported primarily, and in some cases solely, by stating "Plaintiff reports . . ." and listing the symptoms Plaintiff described to Dr. Andrews. (R. 330-36.) However, these symptoms appear to conflict with other medical assessments contained in the record, some of which were conducted by other professionals at East NY Center whom Dr. Andrews appears to have supervised. Specifically, based on assessments from multiple practitioners, including those of Dr. Manyam, Dr. Alexander and Dr. Donahue, Plaintiff's medication appears to have been keeping his reported symptoms under control. (R. 290, 299, 304-05.) The reports of these examiners are also consistent with Plaintiff's testimony to the ALJ during which he stated he felt "much better" on his medications. (R. 50.)

Dr. Andrews' assessment also conflicts with the findings of consultative examiners Drs. Alexander and Gagan. Dr. Alexander, for example, concluded Plaintiff could "follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently,

make appropriate decisions, relate adequately with others, and can appropriately deal with stress." (R. 306.) As a result, Dr. Alexander concluded that "the results of the examination appear to be consistent with psychiatric problems which are sufficiently controlled and in itself does not significantly interfere with the claimant's ability to function on a daily basis." (*Id.*) This assessment is consistent with Dr. Gagan's examination of Plaintiff, which revealed, among other things, that Plaintiff did not have audio/visual hallucinations and "would be able to understand, remember and carry out simple instructions; maintain [concentration,] pace and persistence; interact [with others] and adapt [to changes]." (R. 326.)

Because the Court finds that Dr. Andrews' opinion is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts," including those of Dr. Manyam, Dr. Alexander and Dr. Gagan, the ALJ did not err by affording limited weight to his opinion. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

### 4. The ALJ's Credibility Assessment

Where, as here, "the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart v. Astrue*, 687 F. Supp.2d 396, 435 (S.D.N.Y. 2010). When the ALJ neglects to discuss at length his credibility determination with sufficient detail to permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence, remand is appropriate. *Id.* at 435-36, 438. SSR 96–7p sets forth seven factors that an ALJ must consider in determining the credibility of a claimant's statements about his or her symptoms and the effects of his or her impairments:

> (1) The individual's daily activities; (2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . ; and (7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7P; *see* 20 CFR § 416.929(c); 20 C.F.R. § 404.1529.

Plaintiff argues that the ALJ failed to provide "the required detailed credibility analysis utilizing all the criteria" provided by the regulations. (Pl. Cross. Mot. at 11.) As an initial matter, while it may be true that the ALJ did not explicitly list the seven factors under consideration, where, as here, the Court concludes that the ALJ properly considered the required factors and that the ALJ's credibility determination is supported by substantial evidence in the record, the ALJ's failure to list all factors he evaluated does not require remand. *See Cichocki v. Astrue*, 534 F. App'x 71, 75-76 (2d Cir. 2013) (Summary Order) ("Although the ALJ did not explicitly recite the seven relevant factors, his credibility determination was supported by substantial evidence in the record. . . . Because the ALJ thoroughly explained his credibility determination and the record evidence permits us to glean the rationale of the ALJ's decision, the ALJ's failure to discuss those factors not relevant to his credibility determination does not require remand."); *see also Lao v. Colvin*, 2016 WL 2992125, at *16-17 (E.D.N.Y. May 23, 2016) (finding that case need not be remanded for failure to explicitly consider all seven factors where there was "ample support in the record for the ALJ's conclusion that the Plaintiff's statements regarding the intensity of his symptoms were not credible").

In any event, the ALJ discussed the relevant credibility factors in his analysis. The ALJ ultimately credited Plaintiff's testimony to the extent that the medical impairments could

reasonably be expected to cause the symptoms Plaintiff alleged, but found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. at 24.) In performing that analysis, the ALJ conducted the assessments required by the regulations. The ALJ determined, among other things, that Plaintiff is able to engage in a range of activities independently and has had comparatively little medical treatment despite claiming to have the same impairments for decades. (R. 21-22.) As discussed earlier, Plaintiff's own testimony at his hearing indicated that he is able he can cook, clean, attend medical appointments and use public transportation independently, which the ALJ took into account in assessing credibility. (R. 21-22, 51-52.) Plaintiff also reported his pain had been reduced to a "2/10" when on medication. (R. 299.)

The ALJ also assessed Plaintiff's inconsistent statements in the record. (R. 22.) Among these, Plaintiff was inconsistent with respect to his use of public transportation (*compare* R. 335 *with* R. 52, 196, 304), his work history (*compare* 182, 304 *with* 334 *and* 274) and the frequency of his auditory hallucinations (*compare* 50, 290, 299, 304-05 *with* 334). With respect to Plaintiff's work history in particular, at several points in the record Plaintiff indicated he had stopped working because of his physical limitations (specifically his back) (R. 52, 196, 304), but told Dr. Andrews that he had stopped working because he lost his job after a fight with his boss (R. 334) and told Dr. Donahue that he was dismissed because he didn't bring in enough business (R. 274).

The Court's review of the record confirms the ALJ's conclusion that Plaintiff's testimony was "not entirely credible" is supported by substantial evidence. *See Correale-Englehart v. Astrue*, 687 F. Supp.2d at 435-36.

### 5. The ALJ's Application of the Grids

Plaintiff challenges the ALJ's finding at the fifth step of the analysis, arguing that the ALJ was required to call a vocational expert. (Pl. Cross Mot. at 4.) At the fifth step of the five-step analysis, the Commissioner has the burden to show that there are other jobs in the national economy that the Plaintiff is capable of performing. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll v. Secretary of Health and Human Services*, 705 F.2d 638, 642 (2d Cir. 1983). To meet this burden, the Commissioner may utilize the Medical Vocational Guidelines, otherwise known as "the Grids," which account for the Plaintiff's RFC, age, education, and work experience. *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir.1999); 20 C.F.R. § Pt. 404 Subpt. P, App. 2. However, "exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations" such as "where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform. In these circumstances, the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Rosa*, 168 F.3d 78 (citations and internal quotation marks omitted).

At the fifth step here, the ALJ applied the Grids to determine that 20 C.F.R. § Pt. 404, Subpt. P, App. 2, § 201.21 directed a finding of "not disabled" prior to February 24, 2013. This conclusion was reached by applying Plaintiff's education level ("High school graduate or more"), previous work experience ("Skilled or semiskilled—skills not transferable") and age ("Younger individual age 45-49.") (*See* R. 25; 20 C.F.R. § Pt. 404, Subpt. P, App. 2, § 201.21.) The ALJ recognized that Plaintiff's ability to perform all of the requirements of this work level was impeded by additional limitations, but found that those limitations had little or no effect on the occupational

base of unskilled sedentary work. (R. 25.) The ALJ noted that Plaintiff "has the ability to understand, remember, and carry out simple instructions; make simple work-related decisions; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting on a sustained basis." (*Id.*)

As discussed above, the Court agrees with the bases for the ALJ's assessment regarding Plaintiff's mental (*i.e.* non-exertional) limitations, and as a result, finds that it was not necessary for the ALJ to call a vocational expert under these circumstances. *See Zabala v. Astrue*, 595 F.3d 402, 410-11 (2d Cir. 2010) ("[T]he 'mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the guidelines.' A nonexertional impairment 'significantly limit[s]' a claimant's range of work when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.") (quoting *Bapp v. Bowen*, 802 F.2d 601, 603, 605-06 (2d Cir.1986)). Moreover, the ALJ did not err by "mechanically" applying the grids to find Plaintiff disabled only after he turned fifty.[7] As of that date, Plaintiff was considered a person of "Closely approaching advanced age," which for people with the same education and previous work experience directed a finding of "Disabled" pursuant to § 201.14 of the Grids. Such direct applications of the grids are routinely upheld by courts. *See, e.g.*, *Petti v. Colvin*, 2014 WL 6783703 (E.D.N.Y. Dec. 2, 2014); *Grant v. Astrue*, 2010 WL 3341662 (S.D.N.Y. Aug. 18, 2010).

---

[7]     Although Plaintiff did not raise this argument in his Cross Motion, it was raised by his prior lawyer in a letter to the Appeals Counsel so the Court addresses it here briefly. (*See* R. 226.)

**CONCLUSION**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted. Plaintiff's cross-motion for judgment on the pleadings is denied. The appeal is dismissed.

SO ORDERED.

Dated:  Brooklyn, New York
          September 30, 2016

_____
                    /s/
          DORA L. IRIZARRY
              Chief Judge